**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**

FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

11 MAR 16 AM 9: 52

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Civil Action No. _____ |
| TIMOTHY S. DURHAM, JAMES F. COCHRAN, and RICK D. SNOW, | : **1 : 11 -cv- 0370 JMS -MJD** |
| Defendants. | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

### SUMMARY

1. This matter involves an offering fraud orchestrated by the three senior executives of Fair Finance Company ("Fair"), an Ohio-based consumer finance company. From at least 2005 through November 2009, defendants Timothy S. Durham, Chief Executive Officer, James F. Cochran, Chairman, and Rick D. Snow, Chief Financial Officer, raised approximately $230 million from at least 5,200 investors through the sale of investment certificates by making materially false and misleading misrepresentations and omissions concerning, among other things, Fair's profitability and financial condition, the safety and security of investors' principal and returns, and the use of investor proceeds.

2. In 2002, defendants Durham and Cochran purchased Fair, which had operated for decades as a successful finance company that earned profits by using investor proceeds to purchase discounted consumer receivables. Following the acquisition, defendants changed Fair's

historical business model and used a steadily increasing amount of investor proceeds to finance the unprofitable and failing businesses controlled by Durham and Cochran under the guise of loans (the "Related Party Advances"), to make interest and redemption payments to investors, and for the benefit of themselves, their families and friends.

3.     By 2009, defendants had booked more than $200 million as "loans" in Fair's financial statements, which accounted for approximately 90 percent of Fair's purported investments.  The defendants represented in Fair's offering circulars that investor funds would be used to make legitimate loans which, in turn, would generate the promised returns on the investment certificates.  Defendants instead used investor proceeds for themselves and their companies that had serious financial problems, including insufficient earnings or collateral to support repayment of their debt.

4.     While raising money from investors, the defendants knew that the majority of the related parties were essentially insolvent, but nonetheless continued to accrue revenue and carry the non-performing loans at an inflated value in Fair's financial statements, thereby deceiving investors as to Fair's true financial condition.

5.     In fact, the majority of related parties did not make interest or principal payments to Fair and, ultimately, the defendants used new investor proceeds to repay earlier investors in the nature of a Ponzi scheme.

6.     As a result of the conduct described in this Complaint, defendants Durham, Cochran, and Snow violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

2

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], to enjoin such acts, transactions, practices, and courses of business, to obtain disgorgement and civil penalties, and for other appropriate relief.

8.      This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

9.      Venue is proper because certain of the acts, transactions, practices, and courses of business constituting the violations alleged herein occurred within the Southern District of Indiana.  Fair advanced millions of dollars of investor funds to companies located in, or operated out of, the Southern District of Indiana.  Furthermore, defendants Durham, Cochran, and Snow worked and resided in the District.

10.      In connection with the conduct alleged in this Complaint, the defendants directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, or the means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange.

## DEFENDANTS

11.      **Timothy S. Durham**, age 48, is a resident of Los Angeles, California and Fortville, Indiana.  Since 2002, Durham has served as the Chief Executive Officer and a Director of Fair, an Officer and Director of Fair Holdings, Inc. ("Fair Holdings"), Fair's parent, and a Member of DC Investments, LLC ("DCI"), Fair Holdings' parent.  Durham and his business partner, defendant James F. Cochran, each own 50 percent of Fair, Fair Holdings, and DCI.

3

Also, since 2001, Durham has served as the Chairman of the Board and Chief Executive Officer of Obsidian Enterprises, Inc. ("Obsidian"), and, since 2008, as the interim President and Chief Executive Officer of National Lampoon, Inc. ("National Lampoon").

12.     **James F. Cochran**, age 55, is a resident of McCordsville, Indiana.  Since 2002, Cochran served as a Director and Chairman of the Board of Fair, a Director and Officer of Fair Holdings, and 50 percent owner of Fair, Fair Holdings and DCI.

13.     **Rick D. Snow, C.P.A.**, age 47, is a resident of Fishers, Indiana.  Snow is a certified public accountant licensed in Ohio.  Upon information and belief, Snow's license is currently inactive.  Since 2002, he has been the Chief Financial Officer of Fair, and in 2003, he became the Chief Financial Officer of Obsidian.  In 2009, he was appointed as the interim Chief Financial Officer of National Lampoon.

## **RELATED ENTITIES**

14.     **Fair Finance Company**, established in 1934, is a private Ohio corporation with its principal place of business in Akron, Ohio.  Fair provided consumer financing services by purchasing and servicing consumer receivables and operated under the names "Fair Financial Services" and "Fair Financial."  As explained in more detail below, the company historically financed its operations, in part, through the sale of variable rate investment certificates to the public from nine branch offices located throughout Ohio.  During the period of the fraud, from 2005 through 2009, the sale of these investment certificates became increasingly vital to the continued viability of the company, and the company's only significant source of cash.  In February 2010, Fair was forced into involuntary bankruptcy proceedings under Chapter 7 of the United States Bankruptcy Code.

15.     **Fair Holdings, Inc.** is an Ohio corporation with its principal place of business in Indianapolis, Indiana.  At all relevant times, Fair Holdings was the parent and sole shareholder of Fair.  Fair Holdings is wholly-owned by DCI.  Fair Holdings was one of the largest recipients of Related Party Advances during the period of the fraud and distributed much of the money it received through its line of credit to Durham, Cochran, and other related entities.

16.     **DC Investments, LLC** is an Indiana limited liability corporation owned and controlled by Durham and Cochran with its principal place of business in Indianapolis, Indiana.  At all relevant times, DCI owned 100 percent of Fair Holdings.  Both DCI and Fair Holdings together were among the largest recipients of Related Party Advances during the period of the fraud and distributed much of the money it received to Durham, Cochran, and other related entities.

17.     **Obsidian Enterprises, Inc.** is a Delaware corporation with its principal place of business in Indianapolis, Indiana.  In 2001, Durham formed Obsidian (formerly known as Danzer Industries, Inc.), which was a publicly-traded holding company (OTC: OBSD) until 2006.  Durham was the majority owner and also controlled Obsidian.  Obsidian has a variety of subsidiary companies, including a rubber reclaiming company and various automotive trailer companies.  Obsidian was one of the largest recipients of Related Party Advances during the period of the fraud and distributed much of the money it received to its subsidiaries and related individuals and entities.

## FACTS

**I.     Background of Fair**

18.     Before Durham and Cochran acquired the company in 2002, Fair operated as a family run consumer finance company for decades.  Fair financed its operations through the sale

5

of variable rate investment certificates to Ohio residents and from revenue it generated from purchasing and servicing consumer receivables.

19.     Fair purchased finance contracts between businesses and their customers that carried interest rates ranging from 18 to 24 percent. Fair purchased the finance contracts at a discount and obtained the rights to collect future contract payments from the customer. Fair profited on the difference between the discounted purchase price of the finance contracts and the amount it collected from customers under the contracts.

20.     Fair's primary source of financing for its business was the sale of 6 to 24-month investment certificates, paying an annual rate of return on the certificates that averaged approximately two percent above typical bank certificates of deposit. Fair could historically pay this return because of the high rate of return it earned on its consumer finance contracts. At maturity, investors had the option of either redeeming their certificates or rolling the balances over into new certificates.

21.     Fair successfully employed this business model for decades and developed a reputation with its investors as a trustworthy, stable company.

**II.      Durham and Cochran Purchased Fair and
Continued Offering Investment Certificates**

22.     In January 2002, Durham and Cochran purchased Fair in a leveraged financing transaction for $23 million through their jointly-owned holding company, Fair Holdings.

23.     After the acquisition, defendants Durham and Cochran, as Fair's sole owners, exercised complete control over Fair's operations. Along with Snow, each controlled the company's accounting and financial reporting and were responsible for the representations in Fair's offering circulars. At all relevant times after the acquisition, Durham and Cochran acted by and through Fair.

24.     At all relevant times after the acquisition, as Fair's Chief Financial Officer, defendant Snow maintained Fair's books and records and regularly consulted with Durham on accounting and finance issues, including use of investor proceeds, the preparation of financial statements, and the disclosure of Fair's financial condition to investors and to the Ohio Division of Securities.

25.     Along with the other defendants, Snow played a central role in the accounting for the Related Party Advances, as well as in the disclosures made to investors. At all relevant times after the acquisition, Snow acted by and through Fair. Between 2005 and 2009, Snow received at least $1,365,000 in compensation from Fair.

26.     Fair registered its offerings of investment certificates with the Ohio Division of Securities and claimed an exemption from registration with the Commission. At all relevant times after the acquisition, approximately every 16 months, defendants submitted a new application, along with a proposed offering circular, to the Ohio Division of Securities to renew Fair's offering.

27.     On at least four occasions between 2005 and 2009, the defendants renewed Fair's securities offering with the Ohio Division of Securities. Thus, defendants distributed at least four different offering circulars to investors during the period of the fraud. The offering circulars varied in length (generally less than 50 pages) and contained sections relating to, among other things, Fair's business model and operations, management, investment options, risk factors, and the use of proceeds.

28.     Defendants also included the consolidated financial statements of Fair and its parent, Fair Holdings, as part of the offering circulars. Durham certified the financial statements in the offering circulars from 2005 through 2009.

7

29.     Defendants advertised Fair's investment certificates through local newspapers and employed a sales staff to sell the investment certificates from branch offices located throughout Ohio.  Defendants controlled the marketing message used in the branch offices.  Fair's sales representatives gave a standard presentation to prospective investors that focused on Fair's long and reliable history as a consumer finance company and provided investors with a copy of the offering circular.

30.     Many of Fair's investors were elderly persons with modest incomes.  They purchased the investment certificates because of their relatively high interest rates and Fair's well-established reputation of having successfully offered similar investment certificates for decades.

31.     As detailed below, the defendants made numerous material misrepresentations and omissions regarding, among other things, Fair's profitability and financial condition, the safety and security of investors' principal and returns, the source of purported investment returns, and the use of investor proceeds both orally and in written statements included within Fair's offering circulars and financial statements distributed to Fair investors.

## III.    The Fraud

### A.     The Defendants Shifted Business Away from Consumer Financing, Advancing Large Sums of Cash to Themselves and Their Related Companies.

32.     Immediately after purchasing Fair in 2002, Durham and Cochran significantly changed the company's business operations away from its historical consumer finance model.

33.     Durham and Cochran, under the guise of loans, diverted a steadily increasing amount of investor proceeds to themselves personally and to more than 50 individuals and numerous struggling and unprofitable entities controlled by Durham and Cochran.  Durham,

Cochran and Snow knew that neither Durham, Cochran, nor the related companies had the earnings, collateral or other resources to ensure repayment of their purported debt to Fair.

34.     As reflected in Chart A, the claimed value of the "loans" to related parties grew from zero in 2001 to $200.9 million by November 2009, while the value of consumer finance receivables held by Fair declined from $72 million to $25 million.  Further, as a percentage of overall purported "assets," consumer finance receivables declined from 100 percent in 2001 to 11 percent in November 2009.

| CHART A | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 11/09 |
| **Investor Proceeds** | 13.7 | 31.1 | 25.9 | 40.8 | 43.2 | 47.0 | 47.0 | 46.7 | 46.1 |
| **Subordinated Debt** | 37.0 | 66.5 | 82.3 | 111.8 | 138.7 | 160.9 | 182.7 | 192.5 | 207.2 |
| **Finance Receivables** | 72.0 | 51.1 | 51.8 | 53.1 | 60.7 | 69.4 | 37.7 | 49.0 | 25.0 |
| **Related Party Loans** | 0 | 20.7 | 40.2 | 64.6 | 88.2 | 111.9 | 144.2 | 180.7 | 200.9 |

(Figures are in millions of dollars.  Categories other than Investor Proceeds are cumulative.)

35.     While steadily increasing the amount of investor proceeds they diverted to Durham and Cochran and their related parties, defendants continued to raise new money from investors to fund these advances and to make interest and redemption payments to certificate holders.  Between 2005 and 2009, defendants fraudulently raised approximately $230 million from the sale of investment certificates to approximately 5,200 investors.

36.     The annual and accumulated increases in sales of new investment certificates ultimately created a significant and unsustainable amount of debt that Fair had to service on a monthly, quarterly, and annual basis.  Fair's investment certificates were unsecured and junior to other Fair debt and was reported as "subordinated debt" on Fair's balance sheet, representing the principal and interest owed to investors.  As reflected in Chart A, in 2001, before the acquisition, Fair's subordinated debt was only $37 million.  By November 2009, it had climbed to $207 million.

9

**B.     Durham and Cochran Used Investor Proceeds For Their Personal Benefit and Recorded Them As Related Party Loans From Fair.**

37.     As reflected in Chart A above, Durham and Cochran transferred more than $20 million of investor proceeds to "related parties" in just the first year they owned Fair.  Each year thereafter they continued to advance millions of dollars to themselves and their related companies.  By November 2009, they had advanced more than $200 million of Fair's money to "related parties."

38.     Durham and Cochran advanced a large portion of this money directly to themselves.  Even according to Fair's own financial statements, prepared by the defendants, Durham and Cochran directly received more than $30 million from Fair by 2009 – in addition to funds they funneled to themselves through their related companies.

39.     Durham and Cochran used this money to pay their daily living expenses and to support lavish personal lifestyles, including mortgages for multiple homes, more than 40 classic and exotic cars worth over $7 million, a $3 million private jet, a $6 million yacht, hundreds of thousands of dollars of gambling and travel expenses, credit card bills, and country club dues, and for elaborate parties, and other forms of entertainment and expenditures.  They also distributed large amounts of money to family members and friends.

40.     Durham and Cochran also funneled large amounts of the Related Party Advances to struggling companies and risky start-up ventures that they owned or otherwise controlled, including a rubber reclamation company, a luxury coach manufacturer, a car magazine, multiple restaurants, a surgery center, trailer manufacturers, Internet companies, a race car team, a replica vintage car manufacturer, and a food catering service.  Durham, Cochran, and Snow often advanced investor proceeds to Durham and Cochran and their related companies by funneling the funds through Fair Holdings (Fair's parent), DCI, and/or Obsidian.

41.     Chart B summarizes the cumulative totals for Related Party Advances that Durham and Cochran diverted to themselves and certain entities they controlled. Several of the largest loans carried on Fair's books were to DCI, Obsidian, and U.S. Rubber, all of which were controlled largely by Durham and Cochran.

| CHART B | | | | | |
|---|---|---|---|---|---|
| | **2005** | **2006** | **2007** | **2008** | **09/30/09** |
| **Obsidian** | $13,572,657 | $17,887,987 | $21,969,005 | $26,469,750 | $29,861,710 |
| **U.S. Rubber** | $5,293,878 | $8,731,878 | $11,089,551 | $11,062,551 | $15,579,846 |
| **DCI** | $32,399,703 | $44,663,865 | $46,057,121 | $63,725,983 | $52,702,041 |
| **Durham** | $6,592,182 | $9,167,963 | $18,322,145 | $23,773,229 | $24,794,667 |
| **Cochran** | $2,096,112 | $3,829,890 | $6,430,459 | $7,870,763 | $8,383,062 |

42.     Defendants provided DCI with a "line of credit" that Durham and Cochran used to prop up their failed start-up ventures and other speculative investments. They also used millions of dollars advanced through DCI to fund personal expenditures for themselves, as well as their friends, family, and employees. None of these activities created the returns necessary to repay the interest on the loans, much less the principal.

43.     After 2005, Obsidian was little more than a shell company with virtually no revenue or significant assets or operations. Obsidian accumulated operating losses of $20 million from at least 2005 on, and its liabilities far exceeded the value of its assets. As early as March 2005, Durham and Cochran confirmed in e-mail communications that the financial condition of Obsidian was deteriorating. Between 2005 and 2009, Obsidian had no realistic possibility of repaying its purported debt to Fair. As CFO of both Fair and Obsidian, Snow knew, or was reckless in not knowing that Obsidian could not repay its debt.

44.     U.S. Rubber likewise had continuing net losses as far back as 2001, and, as of September 2006, its liabilities far exceeded its assets. It also could not repay its purported debt to Fair.

45.     Similarly, as shown below, Durham and Cochran had no ability to – and did not – repay their debt to Fair.

**C.     Defendants Knew the Related Party Advances Were Inadequately Collateralized and Made to Individuals and Entities that Lacked Earnings or Financial Resources to Ensure Repayment of Their Debt to Fair.**

46.     As noted above, Durham, Cochran, and Snow claimed that the Related Party Advances were loans.  They recorded them in the financial statements as *assets* on Fair's balance sheet under the line item, "Loan receivables, related parties."  In addition, defendants recorded certain advances that went to related parties as "Other loan receivables."

47.     From 2002 through 2009, defendants maintained the purported loans at almost full value on the balance sheet, recording only minimal "loan loss reserves" – a way of accounting for the estimated loans that would be ultimately unrecoverable.  For example, in 2009, at a time when defendants claimed more than $200.9 million in loans as assets, they recorded only approximately $10.9 million as loan loss reserves for all receivables (the Related Party Advances and the finance receivables), or approximately 5.4%.  In other words, at all times, defendants represented in the financial statements given to investors that they reasonably expected the Related Party Advances to be repaid nearly in their entirety, with interest, thus reflecting a strong and substantial asset for Fair.

48.     However, few of the related parties made significant payments of interest or principal on any of the Related Party Advances from 2005 through 2009.  Consequently, the large majority of the related party loans were, at all times, non-performing, impaired assets.

49.     In some instances, when Durham and Cochran and the related parties did make payments on the purported loans, the source of the payments was *additional* advances that were "round-tripped" from Fair.  For example, if defendants advanced funds to themselves or to a

related party, defendants used, or arranged for their related party to use, a portion of that new money to make a payment on the purported loan. Thus, while Fair's accounting showed a payment, in reality, defendants actually financed the payment through further advances from Fair.

50.    Each year, defendants also improperly accrued interest on the Related Party Advances as revenue. Accrual refers to a company's recognition of interest on a receivable as having been earned when the interest payment has not yet been received. Although the defendants did not differentiate in Fair's financial statements interest accrued on the Related Party Advances from interest accrued on the finance receivables, defendants annually recorded as much as $20 million or more in accrued interest revenue on the Related Party Advances. This represented up to two-thirds of Fair's reported annual revenue.

51.    The defendants accrued interest on the purported loans even though they knew that they should have written-down or charged-off most of the loans entirely.

52.    Because Durham, Cochran, and their related entities had no ability to repay the purported loans, defendants had no reasonable basis to accrue interest on these purported loans. Thus, the accrued "revenue" reported in Fair's financial statements from the related party loans was wholly illusory and a sham because it consisted of accrued interest on worthless "loans" and not cash received by Fair.

53.    By annually reporting significant amounts of fictitious revenue ostensibly as interest, and recording the value of the loans at near full value, defendants concealed Fair's rapidly deteriorating financial condition and the fact that it had been operating at a loss since at least 2005.

54.     Not only were the loans non-performing and not generating any revenue, they were also improperly and inadequately collateralized, which further reduced their realizable value.

55.     Defendants represented in Fair's offering circular that the related party loans were secured through publicly and privately traded securities, equipment, real estate, and other personally held assets of Durham and Cochran.  Durham also provided personal guarantees for many of the related party loans.  However, this collateral either never existed or its value was woefully deficient compared to the size of the purported loans.  Moreover, defendants did not take steps to perfect the security interests in the purported collateral.

56.     The Related Party Advances were also not all properly documented as loans.  For many of the advances, there was little or no loan documentation, and the terms often did not require payments until maturity.  Few loans ever reached maturity, because when the maturity date approached, defendants routinely amended the loan agreements to extend the repayment dates.

57.     Defendants were acutely aware of all of the shortcomings and problems associated with the purported related party loans described herein because they handled every aspect of the purported loans on each side of the transactions.  Defendants also decided who to advance the money to and how much money to advance.  They further decided how to document the loans, how much collateral to supply, and how to account for the advances in the financial statements.  Finally, because Durham, Cochran, and the entities they controlled received the purported loans, they were responsible for, and well aware of, the lack of repayment.  Similarly, because Snow handled the accounting of the purported loans, he also knew they produced almost no cash for Fair.

14

58.    Defendants also understood the precarious financial situation at Fair caused by its steadily increasing Related Party Advances, associated liquidity constraints, and its rapidly expanding subordinated debt owed to the certificate holders.  Despite this knowledge, the defendants continued to raise millions of dollars from investors.

## IV.    Defendants Ignored Fair's Outside Auditors' Warnings About Overvaluing of the Related Party Advances

59.    As early as 2005, Fair's independent outside auditors warned Durham, Cochran, and Snow about their mischaracterization of Fair's financial condition by overvaluing the Related Party Advances.

60.    In April 2005, during its attempt to audit Fair's 2003 and 2004 financial statements, Fair's independent outside auditor identified numerous problems with Fair's accounting and financial reporting surrounding the Related Party Advances.

61.    The auditor found, among other problems, rapidly increasing loan balances, erratic or no payment activity on the loans, lack of policies and procedures governing underwriting and credit evaluation, and the continued deteriorating financial condition of the borrowing entities, primarily Obsidian, one of the largest purported loan recipients.

62.    The auditor told defendants about these deficiencies and explained that because of the "increasing magnitude" of the problems surrounding the purported related party loans, the auditor could not issue an unqualified audit opinion for fiscal year 2003 or conduct an audit for fiscal year 2004.

63.    The auditor also disclosed to defendants that they found that Fair had no underwriting procedures for monitoring credit and impairments of related party loans at Fair, or sufficient documentation supporting advances to related parties, including loan documents and collateral security agreements.  The auditor also discovered that the defendants were recognizing

15

revenue on non-performing loans or loans for which future collection was doubtful, without having performed an appropriate loan impairment analysis, including loss reserves and collateral values.

64.    The auditor further indicated that the economic substance of many of the Related Party Advances suggested that the defendants improperly classified them as loans in the financial statements when, in fact, they were investments.  Classification of the Related Party Advances as investments would have, among other things, made it impossible for defendants to accrue interest on the "loans" in the financial statements.

65.    Concluding that the purported related party loans had significant problems, the auditor also told the defendants that they had been materially overstating Fair's income because of the failure to expense Fair's probable loan losses.  The auditor told defendants to increase Fair's reserve for loan losses for the year ended 2003 from $2 million to at least $11.5 million.

66.    The auditor told defendants that they should have accounted for Fair's probable loan losses by recording an expense (normally called a "provision" for loan losses) in the period in which a loan loss becomes probable and quantifiable.  This would have been reflected on the company's balance sheet as a credit (or reduction) to the loan portfolio.  In addition, the defendants should have continuously monitored the credit quality of the loan portfolio to ensure reserves remained adequate.  Durham, Cochran, and Snow failed to correct these and other problems identified by the auditors.

67.    Defendants understood that making these accounting changes, and disclosing the reduced related party loan value in the financial statements and offering circulars could prevent them from continuing to raise additional funds through the sale of investment certificates.  Durham admitted as much when he commented in an e-mail that he did not want the auditor to

16

write-off certain purported related party loans because it would jeopardize the ability to renew Fair's offering with the Ohio Division of Securities.

68.     Defendants never corrected any of the deficiencies in Fair's policies and procedures, underwriting, accounting, or financial reporting identified by the outside auditor. The defendants likewise never revised Fair's financial statements to reflect accurate loan loss reserves, and they further continued to improperly accrue interest on the related party loans that were not being repaid.

69.     Instead of undertaking any of the steps the auditor identified, in June 2005, the defendants fired the auditor and engaged a new auditor to audit Fair's 2003 and 2004 financial statements.

70.     Throughout this time, the defendants continued raising funds from investors without disclosing the prior auditor's findings to current or prospective investors or to the Ohio Division of Securities.

71.     Fair's new auditor told defendants that it had found many of the same problems as those identified by the prior auditor, including collateral deficiencies and accrual of interest on purported loans that had little or no history of interest or principal payments.

72.     Ultimately, the new auditor agreed to issue an unqualified audit opinion to Fair for fiscal years 2003 and 2004 only after Durham identified sufficient personal assets to pledge as collateral for the deficient purported loans.  However, Durham never followed through with filing and/or perfecting the security interests in the assets he agreed to pledge as collateral.

73.     In attempting to audit Fair for fiscal year 2005, the new auditor informed the defendants that the collateral for the purported related party loans was deficient by at least $20.5 million.  This deficiency represented approximately 33 percent of Fair's total purported related

party loans in 2005. In the absence of proper collateral, defendants should have established a $20.5 million loan loss reserve.

74.    Establishing a $20.5 million loan loss reserve in 2005 would have resulted in a net loss to Fair of approximately $20 million and a deficit in stockholder's equity of approximately $14 million. The auditor proposed issuing a qualified audit opinion to Fair and Fair Holdings on the basis that recurring losses and liabilities in excess of assets at Obsidian and other related companies raised concerns about Fair Holdings' ability to continue as a going concern.

75.    Durham told the auditor that he opposed the issuance of a qualified audit opinion that detailed such a large net loss. Durham and his co-defendants knew that if Fair's auditors issued a qualified opinion detailing Fair's rapidly declining financial condition spawned by the non-performing Related Party Advances, the Ohio Division of Securities would have revoked Fair's offering registration. Without the ability to raise funds from new investors, Fair would not have been able to make interest and redemption payments to prior investors, and, consequently, the company would have quickly collapsed – leaving defendants without a source of funds to finance their business ventures and extravagant lifestyles.

76.    Instead of properly accounting for Fair's materially deficient loan loss reserves, the defendants yet again fired Fair's auditor.

77.    Having been told from two different outside auditors that they were misrepresenting the value of the purported related party loans, the defendants never again sought to have an independent audit of Fair's financial statements. Instead, until Fair's collapse in November 2009, either Durham and/or Snow prepared, and Durham certified, Fair's financial statements. In doing so, defendants continued to improperly account for the Related Party Advances at grossly inflated values on the balance sheet with only minimal loan loss reserves.

18

### V.    Defendants' Conduct Leads to Fair's Collapse

78.    Because Durham and Cochran diverted significant amounts of cash to themselves and their related entities, Fair faced increasing liquidity problems.

79.    The liquidity problems were highlighted in 2007 by defendants' sale of Fair's consumer receivables in an effort to raise cash.  Durham and Cochran sold approximately $22.8 million of Fair's receivables, and used the proceeds of the sale to repay a Fair Holdings bank loan and note they had used to purchase Fair in 2002.  This sale created a significant reduction in Fair's finance receivables – its only valuable asset – and, as a result, further impaired Fair's ability to generate income to pay its interest obligations to certificate holders.

80.    By year-end 2007, Fair carried only $37.7 million of finance receivables, comprising just 19 percent of Fair's total loans and service receivables, compared to $144 million in related party loan receivables.  In 2008, however, the defendants used these remaining receivables as collateral so Fair could obtain a $50 million line of credit, thereby encumbering the only significant asset Fair owned that could be sold to repay certificate holders.

81.    In September 2008, Cochran and Durham admitted in e-mails that Fair was in financial turmoil.  Durham told Cochran that Cochran's assets were probably "way short" if Fair was ever audited by the Ohio Division of Securities.

82.    However, Durham and Cochran's real concern was not the future ability of Fair to pay back its investors; it was for their own personal finances.  Even while Fair was facing financial turmoil, Cochran complained about his need for funds and asked for his salary to be increased to $1 million a year, which he felt he was due because Durham took $150,000 or more per month for "personal operating expenses."  In response, Durham asserted that he had just borrowed and repaid continuously on his line of credit because he had not received any money

from Obsidian in years.  Cochran complained that the money he requested was nothing compared to all of the money they provided to Obsidian and related companies that Fair would never recover.  Durham and Cochran's concern for their own precarious financial condition and their desire to extract additional money from Fair was occurring as Fair spiraled into insolvency, endangering the certificate holders.

83.     In or around October 2008, when Fair's liquidity problems began to intensify, Durham essentially admitted to conducting a Ponzi scheme through Fair.  In e-mails between Durham and Fair's attorney, Durham acknowledged that Fair used a substantial portion of investor proceeds from sales of new investment certificates to pay interest and redemption payments to existing certificate holders.

84.     As the need for cash to pay interest to investors and to fund Fair's operations continued to accelerate by year-end 2008, Durham instructed Snow and Cochran to severely "restrict early cash outs" at the end of each month.  Durham and Cochran also sought to liquidate personal assets to generate funds to meet Fair's interest and redemption obligations.  For example, in an e-mail in or around December 2008, Cochran suggested to Durham that he sell some antiques and some of his cars, which he estimated would bring in around $5 million to $7 million.  Durham responded that he was going to sell a few cars, which should generate around $1 million, but not soon enough.  Durham added, " . . . the problem is at redemptions at 2 million a month we are chasing a black hole."

85.     Despite the cash shortage at Fair caused by the failure of related parties to repay their debts, Durham and Cochran continued to funnel investor funds to themselves and their failing businesses through 2009.  Throughout 2009, Durham continued to instruct his employees

to wire funds from Fair to Obsidian and to other related companies at a time when Durham knew that neither he nor Obsidian could repay the funds to Fair.

86.    By October 2009, Fair was on the brink of collapse.  The defendants had raised approximately $230 million from investors since 2005, and Fair was not receiving payments on the approximately $200 million Durham and Cochran loaned to themselves and their related parties.  The defendants had instituted a 60-day hold on investor redemptions, in effect making Fair's investors wait for what was legitimately owed to them, while Durham and Cochran continued to drain funds from Fair.  Durham also instructed Cochran to contact prior investors to convince them to re-invest with Fair because they had insufficient cash to meet the certificate redemption and interest payments.

87.    On or about October 24, 2009, the <u>Indianapolis Business Journal</u> published an article highlighting possible problems at Fair due to the significant related party loans.  As a result, many investors sought to redeem their investments and raised questions about the related party loans.  Cochran told them that the article mischaracterized Fair's business and touted Fair's long history of success.  Cochran sought to minimize the risk associated with the related party loans and commented that Fair's investments in cars and artwork were "good investments."

88.    Cochran lulled investors by falsely claiming that Fair was in good financial condition and that Fair had done a "wonderful job" that year on profits.  Cochran emphasized to investors that Fair had been in business since 1934 as a thriving consumer finance business and never defaulted on a single investment note.  Cochran further represented that Fair had not written off more than one percent of bad debt in any year and that the value of Fair was at least $260 million.

89.     By November 2009, Fair's registered offering was about to expire and the defendants sought to renew Fair's registration.  However, the Ohio Division of Securities did not renew Fair's offering after the defendants failed to provide sufficient information supporting the Related Party Advances, which at that time had ballooned to more than $200 million and accounted for 90 percent of Fair's investment assets.  Shortly thereafter, Fair was forced into involuntary bankruptcy.  As noted above, the defendants caused more than 5,200 investors to invest a total of approximately $230 million with Fair.  Virtually all of these investors lost their entire investments.

## VI.     Defendants' Misrepresentations and Omissions

90.     From at least 2005 through 2009, the defendants made numerous material misrepresentations and omissions regarding, among other things, Fair's profitability and financial condition, the safety and security of investors' principal and returns, the source of purported investment returns, and the use of investor proceeds.

91.     Defendants misrepresented the financial health of Fair (and its ability to repay investors) primarily by failing to accurately account for, and disclose the nature of, the Related Party Advances and their value to Fair.

92.     Durham and Cochran knew the extent of their own deteriorating financial conditions and that of their related entities.  They also knew their precarious financial predicaments rendered them and the other recipients of the Related Party Advances incapable of repaying their debts to Fair.  Snow, for his part, knew or was reckless in not knowing that Durham, Cochran, and the related parties would be unable to repay the funds they owed to Fair.  Indeed, two different independent auditors told defendants Durham, Cochran, and Snow in 2005 and 2006 that Fair's related party lending practices were seriously flawed and its loan loss

reserves were materially deficient to cover related party loan defaults. However, instead of disclosing this fact and setting proper reserve levels by writing down the value of the purported related party loans on the balance sheet, defendants maintained them on Fair's balance sheet at near full value.

93.     Moreover, while misrepresenting to investors the true value of the related party loan "asset" as early as 2005, Durham and Cochran continued to impair the company's value even more by diverting more and more investor proceeds to themselves and increasing the balance of the Related Party Advances from $88 million in 2005 to more than $200 million by November 2009 – even though these loans were not worth near that amount. Neither Durham nor Cochran, nor their related companies, could repay (or did repay) these loans. As this was happening, Snow was preparing Fair's financial statements knowing the problems associated with the Related Party Advances.

94.     Defendants also caused Fair to misrepresent the nature of its business to investors. While defendants diverted more and more of Fair's assets to related parties, and the company's financial situation deteriorated, defendants continued soliciting new investor funds and reassuring existing investors of the safety of their investments by touting Fair's historical and purported success as a consumer finance company. Defendants did this through the offering circulars, as well as through their instructions to Fair's sales representatives about what to say to prospective investors who visited any of Fair's regional offices. In addition, Cochran engaged in direct solicitation of customers in which he touted Fair's success and strength as a consumer finance company.

95.     The defendants also misrepresented Fair's revenues to investors. Through, among other things, Fair's offering circular and financial statements, defendants disclosed that Fair

generated investment returns by investing in loan receivables that were supposedly generating up to $20 million in annual revenue. These representations were false because defendants were improperly accruing interest on the worthless and uncollectable Related Party Advances and improperly reporting the accrued interest as revenue to Fair. This fictitious revenue accounted for approximately two-thirds of Fair's annual revenue and materially misrepresented Fair's true financial condition. In fact, the Related Party Advances did not generate sufficient revenue to pay Fair's operating expenses, much less investors' interest and redemption payments. In reality, Durham and Cochran siphoned off as much of the investor proceeds as possible and then used the remaining investor proceeds to make interest and redemption payments to earlier investors in the nature of Ponzi scheme.

96.     Although defendants did disclose that Fair would use a portion of investor proceeds obtained from the sale of investment certificates to fund redemptions, they never disclosed that Fair had to use a majority of investor proceeds to fund both interest and redemption payments because Durham, Cochran, and the related parties were not repaying, and were not capable of repaying, the Related Party Advances.

97.     Defendants misrepresented in Fair's offering circulars that the related party loans were properly collateralized. Neither Durham nor Cochran ever pledged sufficient collateral for the related party loans. Defendants falsely represented that Durham and Cochran had securitized many of the Related Party Advances for the benefit of Fair. In reality, they never took the necessary steps to perfect Fair's security interests. Moreover, Snow never sought to ensure that Durham or Cochran had sufficient collateral, income, or other resources to support the Related Party Advances or Durham's personal loan guarantees.

24

98.    Indeed, by mischaracterizing the value of the "loans," the revenue from the "loans," and the collateral supporting the "loans," defendants essentially misled investors by characterizing at least a portion of Durham's and Cochran's uses of investor proceeds as "loans" at all.  In fact, as noted above, although characterized as loans in the financial statements, Durham and Cochran routinely made the purported related party loans without proper documentation, without adhering to loan or credit evaluation procedures (including a collateral analysis), or without otherwise establishing certain terms for payment of interest or principal. Durham and Cochran also used those funds to support their lavish personal lifestyles and the expenses of their private business ventures, while rarely making interest payments.

99.    Defendants made all of the above misrepresentations knowing or with reckless disregard to the fact that they were false, or that they had omitted material facts necessary to make their statements not misleading.  As noted above, Durham and Cochran had first-hand knowledge of the financial health of nearly all the recipients of the Related Party Advances and knew that they were not repaying them, nor could repay them.  Snow had access to all the books and records of Fair, initiated and took direction from Durham and Cochran, and knew that the Related Party Advances were not being repaid and that Durham and Cochran did not have the ability to repay them.  All defendants also understood the precarious liquidity problems created by the lack of cash generated by the Related Party Advances and the ever increasing burden of the debt obligations to certificate holders.

100.    All of these misrepresentations and omissions together left the investors and perspective investors in Fair with the false impression that Fair was a vibrant and strong consumer finance company.  In reality, between 2005 and 2009, defendants were essentially

looting the company of its valuable assets and replacing them with impaired Related Party

Advances that they falsely represented to the public as having strong value.

## FIRST CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act

101.   Paragraphs 1 through 100 are realleged and incorporated herein by reference.

102.   From at least 2005 through November 2009, as a result of the conduct alleged

herein, defendants Durham, Cochran, and Snow, knowingly or recklessly, in the offer or sale of

securities, directly or indirectly, singly or in concert, by the use of the means or instruments of

transportation or communication in interstate commerce, or the means or instrumentalities of

interstate commerce, or the mails, or the facilities of a national securities exchange:

(a)   employed devices, schemes or artifices to defraud;

(b)   obtained money or property by means of, or made, untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)   engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon offerees, purchasers, and prospective purchasers of securities.

103.   By engaging in the foregoing conduct, defendants Durham, Cochran, and Snow

violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

104.   Paragraphs 1 through 103 are realleged and incorporated herein by reference.

105.   From at least 2005 through November 2009, as a result of the conduct alleged herein, defendants Durham, Cochran, and Snow, knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, singly or in concert, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

   (a)   employed devices, schemes or artifices to defraud;

   (b)   made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

   (c)   engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

106.   By engaging in the foregoing conduct, defendants Durham, Cochran, and Snow violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder.

**WHEREFORE**, the Commission respectfully requests that this Court:

### I.

Issue an injunction permanently restraining and enjoining defendants Durham, Cochran, and Snow from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

### II.

Order defendants Durham, Cochran, and Snow to disgorge all ill-gotten gains derived from the unlawful activities set forth in this Complaint, together with prejudgment interest.

### III.

Order defendants Durham, Cochran, and Snow to pay civil penalties, pursuant to Section 20(d) of the Securities Act and Section 21(d)(3) of the Exchange Act, as a result of the violations set forth herein.

### IV.

Pursuant to Section 20(e) of the Securities Act and Section 21(d)(2) of the Exchange Act, prohibit defendants Durham, Cochran, and Snow from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

## V.

Order such other and further relief as this Court may deem just and appropriate.

Respectfully submitted,

Daniel M. Hawke
Elaine C. Greenberg
David S. Horowitz
Brendan P. McGlynn
G. Jeffrey Boujoukos
Scott A. Thompson
Michael J. Rinaldi
Kelly L. Gibson

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile:  (215) 597-2740
BoujoukosJ@sec.gov

Dated:  March 16, 2011