UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| vs. | ) ) ) No. 1:11-cv-00370-JMS-TAB |
| TIMOTHY S. DURHAM, JAMES F. COCHRAN, | ) ) ) |
| *Defendants*. | ) ) ) |
| UNITED STATES OF AMERICA, | ) ) ) |
| *Intervenor*. | ) |

## **ORDER**

Over seven years ago, a jury found now-*pro se* Defendant Timothy S. Durham[1] guilty of wire fraud, securities fraud, and conspiracy to commit wire and securities fraud. Mr. Durham has since exhausted his criminal appellate rights, and the Court reopened this parallel civil proceeding, brought by the Securities and Exchange Commission (the "Commission") in 2016.[2] In August 2017, this Court denied the Commission's Motion for Summary Judgment as it related to civil disgorgement.

---

[1] While Mr. Durham now represents himself, he was previously licensed as both an attorney and Certified Public Accountant.

[2] In addition to Mr. Durham, the Commission brought this civil proceeding against *pro se* Defendant James Cochran. Although Mr. Cochran remains a Defendant in this matter, the Commission recently informed the Court that it is engaged in settlement discussions with Mr. Cochran. [Filing No. 111 at 2.] As such, this Order does not pertain to Defendant Cochran.

On April 13, 2018, pursuant to an order from the Magistrate Judge, [Filing No. 106], the Commission filed a Motion to Determine Disgorgement, which Mr. Durham opposes. That Motion is now ripe for the Court's review.

## I.
### STANDARD OF REVIEW

At the outset, the Court must determine the procedural vehicle for the Motion that is now pending before this Court. One option would be to treat the Commission's Motion as a motion for judgment pursuant to Federal Rule of Civil Procedure 52(a). *See Fontaine v. Metro. Life Ins. Co.*, 800 F.3d 883, 885-86 (7th Cir. 2015) (explaining that an entry of judgment pursuant to Rule 52(a) is "essentially a trial on the papers"). However, in this case, there is no indication that Mr. Durham has stipulated or otherwise consented to this method of resolving the remaining issues in the case. *See, e.g.*, *Tran v. Minnesota Life Ins. Co.*, 2018 WL 1156326, at *5 (N.D. Ill. Mar. 5, 2018) (deciding a case based on Rule 52(a) where the parties had "stipulated that the case should be decided based on the administrative record"); *Marshall v. Blue Cross Blue Shield Ass'n*, 2006 WL 2661039, at *21 (N.D. Ill. Sept. 13, 2006) (permitting the application of Rule 52 "[w]here parties have agreed, as they have in this case, to review based on a defined set of documentary/evidentiary materials"). Accordingly, the Court will apply the standard that is most favorable to the non-moving party – in this case, Mr. Durham – and will analyze the Commission's Motion as a motion for summary judgment under Federal Rule of Civil Procedure 56.

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or

affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not be considered. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND

As set forth in this Court's 2017 Order, this case involves Mr. Durham's dealings with Fair Finance Company ("Fair"), [Filing No. 68-7], where Mr. Durham formerly served as President and Chief Executive Officer, [Filing No. 68-1 at 95-96]. The Seventh Circuit summarized Mr. Durham and his business partners' dealings with Fair as follows:

> They used money invested in Fair to support their lavish lifestyles and to fund loans to related parties that would never be repaid. When the company's auditors raised red flags about its financial status, the auditors were fired. When Fair experienced cash-flow problems, it misled investors and regulators so it could keep raising capital.
>
> Eventually the scheme began to unravel. One of the company's directors, himself under investigation in a separate matter, alerted the FBI that Fair was being operated as a Ponzi scheme. After an investigation, the FBI seized Fair's computer servers and arrested Durham, Cochran, and Snow. A jury convicted them on various counts of conspiracy, securities fraud, and wire fraud.

*United States v. Durham*, 766 F.3d 672, 675-76 (7th Cir. 2014).

On March 16, 2011, the day after he was indicted in the criminal matter, the Commission filed suit against Mr. Durham alleging that he committed civil violations of the Securities and Exchange Acts of 1933 and 1934 (collectively, the "Securities Acts"). On August 18, 2017, this Court granted in part the Commission's Motion for Summary Judgment, [Filing No. 68], permanently enjoining Mr. Durham from future violations of the Securities Acts and from acting

4

as an officer or director pursuant to those Acts, and ordering Mr. Durham to pay a civil penalty. However, in the same order, the Court denied the Commission's Motion for Summary as it related to the Commission's request for $208,830,082.27 in disgorgement. [Filing No. 86 at 13-19.] The Court found that

> Although there is little doubt that Mr. Durham was the beneficiary of significant ill-gotten gains during the duration of his association with Fair [], the amount of his wrongful gains have not been adequately established either by the jury's verdict or by the Commission in its Motion for Summary Judgment.

[Filing No. 86 at 13.] Specifically, the Court found that "evidence was presented at trial, that to some very limited extent, Mr. Durham invested proceeds from Fair [] into legitimate business," and therefore the Court held that it could not say that all investor proceeds constituted "ill-gotten gains as a matter of law," and found that the Commission made "no attempt to account for this evidence." [Filing No. 86 at 14.]

Following months of unsuccessful settlement discussions, the Commission then filed a Motion to Determine Disgorgement, [Filing No. 111], which is now ripe for the Court's review.

## III.
### DISCUSSION

In its Motion, the Commission seeks an order for disgorgement in the amount of $183,137,105.35.[3] [Filing No. 112 at 1.] The Commission argues the criminal trial established that "the money obtained from investors in the form of investment certificate proceeds" was

---

[3] This amount is a reduction from the $208,830,082.27 that the Commission requested in its January 2017 Motion for Summary Judgment. [Filing No. 68.] The reason for the reduction involves a statute of limitations for securities fraud disgorgement recently recognized by the Supreme Court in *Kokesh v. SEC*, __ U.S. __, 137 S. Ct. 1635 (2017). Following the logic of *Kokesh*, the Commission argues that "the relevant time period" at issue in this case "is from March 13, 2006 to November 30, 2009." [Filing No. 111 at 2.]

5

"obtained through fraud." [Filing No. 112 at 2-3.] In support of their Motion, the Commissioner filed a declaration by Howard Klein, a certified public accountant. [Filing No. 111-1 at 1.]

The Commission argues that "[d]isgorgement is about unlawful gain," and that in Mr. Durham's case, "the loss to victims approximates the gain to the defendant." [Filing No. 112 at 4.] The Commission's rationale behind this argument is that "there is no significant distinction between the fraudulently obtained investors' money that went directly into [Mr.] Durham's pocket and the fraudulently obtained investors' money that funded the related party loans," because the related entities were controlled by Mr. Durham such that they were "his alter ego," [Filing No. 112 at 3]. Given the vast number of transactions used to transfer the funds, the Commission contends that the "precise use of the specific proceeds of any particular investment certificate" is "very difficult to trace." [Filing No. 112 at 3.] However, the Commission identifies three specific examples in which they argue that Mr. Durham personally benefitted from the use of investor proceeds:

1. The Commission argues that Mr. Durham "directed approximately $168,350 of investor proceeds" into an account where "two checks totaling approximately $76,450 were made payable to Playboy Enterprises; three $10,000 checks payable to Playboy Playmates Kendra Wilkinson, Bridget Marquardt, and Holly Madison; a $60,000 check payable to Distributing the Peace Records; and a $1,900 check payable to JoeB Nino," (hereinafter the "Playboy Payments"). [Filing No. 112 at 5 (citing Filing No. 68-64).]

2. The Commission argues that Mr. Durham "directed $150,000 of investor proceeds" to "pay for his bill at the Rio Suite Hotel and Casino," (the "Casino Payment"). [Filing No. 112 at 5 (citing Filing No. 68-63).]

6

3. The Commission argues that Mr. Durham "directed $302,000 of investor proceeds to be wired to his business account . . . to his mother." [Filing No. 112 at 5 (citing Filing No. 68-62).]

In support of its request for disgorgement, the Commission directs the Court's attention to a case where the Ninth Circuit rejected an argument that the defendants in the case "were entitled to offsets from the disgorgement amount for business and operating expenses of their company" and found that an entire amount received from investors represented an "ill-gotten gain that unjustly enriched the defendants." [Filing No. 112 at 6 (citing *SEC v. JT Wallenbrock & Associates, et al.*, 440 F.3d 1109 (9th Cir. 2006)).] The Commission contends that the Ninth Circuit "determined that the defendants benefitted from the from the use of investors' money to spend at their discretion – whether to cover up operating expense, invest in start-up companies, pay personal expenses or to pay fake returns to investors to perpetrate the fraud," [Filing No. 112 at 6], and urges this Court to similarly find that Mr. Durham should not be allowed to offset "any fraudulently obtained investor funds that he put in allegedly 'legitimate' businesses which were companies that were used as part of the fraudulent scheme," [Filing No. 112 at 7].

Additionally, the Commission contends that

- Mr. Durham "failed to satisfy his burden of showing that any portion of this amount was unaffected by his fraud," [Filing No. 112 at 8];
- the Commission is entitled to prejudgment interest on any disgorgement amount the Court awards, [Filing No. 112 at 8]; and
- any amount of criminal restitution that Mr. Durham pays back the victims of his securities fraud should be credited towards the disgorgement award, [Filing No. 112 at 8].

7

In response, Mr. Durham contends that the disgorgement amount "should be zero." [Filing No. 116 at 4.] Mr. Durham argues that the Commission "mischaracterized many 'facts'" beginning with the its allegations regarding the Casino Payment. [Filing No. 116 at 4.] Mr. Durham contends that there is no evidence that he benefitted from this payment or that wire transfer effectuating the payment "was not properly disclosed" in the relevant circulars and financial disclosures. [Filing No. 116 at 5.] Regarding the Playboy Payments, Mr. Durham contends that the party at issue was "actually a fundraiser" that "generated funds that recouped these expenses" and that the Playboy Payments did not personally benefit him "in any way." [Filing No. 116 at 5-6.] Regarding the payment to his mother, Mr. Durham argues that this was a withdrawal of her investment and that there was no benefit to him for the withdrawal. [Filing No. 116 at 6.] More broadly, Mr. Durham contends that the Commission "is alleging that every single loss to the investors was somehow an identical match" to Mr. Durham's actual profit or gain. [Filing No. 116 at 9.] Mr. Durham distinguishes *SEC v. JT Wallenbrock* by noting that Ninth Circuit explicitly stated that *Wallenbrock* was "not a case of a partially legitimate company misdirecting or misappropriating revenues." [Filing No. 116 at 11 (citing 440 F.3d at 1114).] Mr. Durham further argues that disgorgement of gross proceeds is only appropriate when a defendant was held jointly and severally liable with the corporations that profited from the offering. [Filing No. 116 at 13 (citing *SEC v. Global Express Capital*, 289 Fed. Appx. 183, 190 (9th Cir. 2008)).] By contrast, Mr. Durham argues that Fair "was not absent of 'any legitimate call of the funds' or 'an entirely fraudulent operation.'" [Filing No. 116 at 18.]

Mr. Durham further alleges he received no benefit from several of the "related party loans" at issue in this case because he had no ownership interest in the borrowers. [Filing No. 116 at 14-16.] He argues that "tens of millions of dollars" were classified as related "were considered related

8

under Ohio law because they were first made between Fair" and its parent company. [Filing No. 116 at 15; Filing No. 116 at 20.] Mr. Durham argues that he signed over his interest in the stock of these companies, thereby remitting any benefit he may have received. [Filing No. 116 at 20.] Mr. Durham also distinguishes this case from others cited by the Commission, arguing that he should not be ordered to disgorge the amount of the bankruptcy loss because he did not receive or obtain funds from Fair, nor was he held jointly and severally liable with any of the corporate entities at issue in this case, nor was he the alter ego of Fair. [Filing No. 116 at 21-23.]

In its reply brief, the Commission argues that Mr. Durham "does not contest the most important fact – that [he] controlled the use of the investor proceeds." [Filing No. 117 at 2.] The Commission disputes Mr. Durham's understanding of disgorgement, arguing that he "fundamentally misconstrues the law of ill-gotten gains as to require a direct personal 'benefit' as opposed to use or control." [Filing No. 117 at 2.] Particularly with regard to the Playboy Payments, the Commission argues that it is not Mr. Durham's enjoyment of the funds, but rather, his misuse of the funds that makes them "ill-gotten gains" that are subject to disgorgement. [Filing No. 117 at 3.] The Commission further states that "there is no need to belabor the overwhelming evidence showing that investors never knew their money was being used to fund [Mr.] Durham's personal pet projects, family and friends, and to pay earlier investors." [Filing No. 117 at 3.] The Commission argues that Mr. Durham was, in fact, Fair's alter ego because "he controlled all of the financial transactions at Fair and controlled to whom the related party loans were made." [Filing No. 117 at 3.] Further, the Commssion argues that Mr. Durham is unable to "quantify or even identify" legitimate expenditures that should be used to offset the disgorgement amount and that "once the Commission establishes a reasonable approximation of ill-gotten gains, the burden is on the defendant to bring forth evidence to the contrary." [Filing No. 117 at 4.]

9

In 2017, Justice Sotomayor, writing for a unanimous Court in *Kokesh v. SEC*, set forth the origin of SEC disgorgement as follows:

> Initially, the only statutory remedy available to the SEC in an enforcement action was an injunction barring future violations of securities laws. In the absence of statutory authorization for monetary remedies, the Commission urged courts to order disgorgement as an exercise of their "inherent equity power to grant relief ancillary to an injunction." Generally, disgorgement is a form of "[r]estitution measured by the defendant's wrongful gain." Disgorgement requires that the defendant give up "those gains . . . properly attributable to the defendant's interference with the claimant's legally protected rights." Beginning in the 1970's, courts ordered disgorgement in SEC enforcement proceedings in order to "deprive . . . defendants of their profits in order to remove any monetary reward for violating" securities laws and to "protect the investing public by providing an effective deterrent to future violations."

*Kokesh*, 137 S. Ct. at 1640 (citations omitted). *Kokesh* further set forth several principles incident to disgorgement. When the SEC seeks disgorgement, "it acts in the public interest, to remedy harm to the public at large, rather than standing in the shoes of particular injured parties." *Id*. at 1643 (citation omitted). The "primary purpose of disgorgement orders is to deter violations of the securities laws by depriving violators of their ill-gotten gains." *Id*. at 1643 (citation omitted). In addition, "SEC disgorgement is not compensatory," and it is within the district court's "discretion to determine how and to whom the money will be distributed." *Id*. at 1644 (citation omitted).

However, *Kokesh* expressly did not determine "whether courts have properly applied disgorgement principles." *Id*. at 1642 n.3. As such, *Kokesh* is of limited assistance in determining a disgorgement amount in Mr. Durham's case. The parties have not directed the Court to any in-circuit authority regarding SEC disgorgement, and the Court's independent research has not uncovered any such authority.

However, the parties do present arguments concerning the application of the Ninth Circuit's *S.E.C. v. JT Wallenbrock & Assocs.*, 440 F.3d 1109 (9th Cir. 2006). *Wallenbrock* is merely persuasive authority in this case, and the Court is not persuaded that it presents analogous

10

facts to the matter now before it. As Mr. Durham correctly points out, the district court in *Wallenbrock* had ordered SEC disgorgement from an individual and two companies jointly and severally. That is not the case here. Therefore, the Commission urges this Court to adopt a holding that the related entities in this matter were Mr. Durham's alter ego. However, the only authority the Commission cites to support such a finding is one paragraph in Mr. Klein's declaration, [*see* Filing No. 112 at 3 (citing Filing No. 111-1 at 5)], and four paragraphs of its initial Motion for Summary Judgment, [Filing No. 112 at 3 (citing Filing No. 69)]. The paragraph of Mr. Klein's declaration to which the Commission points alleges that Mr. Durham "used related entities as conduits to transfer money, either directly or indirectly, to [his] friends, family, and business associates, and to [himself] and failing and/or risky business ventures (often as related-party loans), even though investors were told their investments were being made in the traditional factoring business." Filing No. 111-1 at 5. However, without more, this conclusory statement is insufficient to support the finding that the Commission seeks as a matter of law. As to arguments made in Commission's initial Motion for Summary Judgment, the Court previously held that such allegations are insufficient to establish a disgorgement amount, and the Court reiterates its earlier holding. [*See generally* Filing No. 86.]

In addition, the Ninth Circuit found that *Wallenbrock* was "not the case of a partially legitimate company misdirecting or misappropriating revenues." *Id*. at 1114. The Court is puzzled that the Commission urges the application of *Wallenbrock* given this Court's prior finding that "evidence was presented at trial, that to some very limited extent, Mr. Durham invested proceeds from Fair into legitimate business." [Filing No. 86 at 14.] The Court went onto state that while some of these legitimate businesses had failed, "others remained viable and were assigned to the bankruptcy Trustee," and, as such, the Court declined to "conclude that all Fair investor proceeds

11

constitute ill-gotten gains as a matter of law." [Filing No. 86 at 14.] The Court arrives at the same conclusion here, and rejects the Commission's argument that every dollar obtained from investors was done so through fraud and was, therefore, ill-gotten gains and that such gains, in turn, inured to the benefit of Mr. Durham because he controlled them. [Filing No. 112 at 2-3.]

Having rejected the Commission's argument that the appropriate disgorgement amount is the amount of investor proceeds, the Court now examines whether the Commission has otherwise made an adequate showing for disgorgement. The Court concludes that it has made a sufficient showing with regard to the Playboy Payments, the Casino Payment, and the payment to Mr. Durham's mother. The Court holds that the Commission has met its burden of proving that these amounts represent a reasonable approximation of certain profits to Mr. Durham that are "causally connected to the violation." *United States Sec. & Exch. Comm'n v. Rooney*, 2014 WL 3500301, at *2 (N.D. Ill. July 14, 2014) (citation omitted). The burden therefore shifts to Mr. Durham to prove the approximation is inaccurate, *id*. at *2, and this he has not done. Mr. Durham offers conclusory statements alleging that he did not personally benefit from these payments, but offers no proof in support thereof.

As to any other amounts, the Commission states that "there is no need to belabor the overwhelming evidence showing that investors never knew their money was being used to fund [Mr.] Durham's personal pet projects, family and friends, and to pay earlier investors." [Filing No. 117 at 3.] However, the Commission must do more than simply make blanket allegations; it must provide the Court with enough detail to support a reasonable approximation of ill-gotten gains, which it has not done in its Motion for any amounts other than the Playboy Payments, the Casino Payment, and the payment to Mr. Durham's mother.

The Commission's Motion for Summary Judgment is therefore **GRANTED** as to the Playboy Payments, which total $168,350.00, the Casino Payment in the amount of $150,000.00, and the payment to Mr. Durham's mother in the amount of $302,000.00. The Court **ORDERS** disgorgement in the amount of **$620,350.00**.[4] The Commission's Motion for Summary Judgment is otherwise **DENIED**.

## IV.
### CONCLUSION

For the reasons set forth herein, the Commission's Motion for Summary Judgment, [111], is **GRANTED in part** and **DENIED in part**. The Commission's Motion is **GRANTED** as it relates to payments identified herein, and the Mr. Durham is **ORDERED** to pay disgorgement in the amount of **$620,350.00**, plus prejudgment interest at the rate set forth in 17 C.F.R. § 201.600. In all other regards, the Commission's Motion for Summary Judgment is **DENIED**. Should the Commission wish to proceed to an evidentiary hearing as to additional disgorgement, the Commission shall file a Motion to that effect by **Friday, July 6, 2018**. Otherwise, the Court will enter final judgment.

Date: 6/29/2018

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

---

[4] The Court agrees with the Commission's argument that "any amounts that Defendant Durham does pay back the victims of his securities fraud as criminal restitution," should be "credited towards the disgorgement award." [Filing No. 112 at 9 (citing *SEC v. Palmisano*, 135 F.3d 860, 863 (2d Cir. 1998)]. The Court further agrees that the Commission is entitled to prejudgment interest on the disgorgement amount at the rate set forth in 17 C.F.R. § 201.600.

Distribution:

TIMOTHY S. DURHAM
60452-112
MCCREARY - USP
MCCREARY U.S. PENITENTIARY
Inmate Mail/Parcels
P.O. BOX 3000
PINE KNOT, KY 42635

JAMES F. COCHRAN
#09970-028
LEXINGTON - FMC
LEXINGTON FEDERAL MEDICAL CENTER
Inmate Mail/Parcels
P.O. BOX 14500
LEXINGTON, KY 40512

Jennifer Chun Barry
U.S. SECURITIES AND EXCHANGE COMMISSION (Philadelphia)
barryj@sec.gov

Scott Alexander Thompson
U.S. SECURITIES AND EXCHANGE COMMISSION
thompsons@sec.gov